

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
WESTERN DIVISION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | |
|---|---|
| KELLER SPECIAL TRUST: WOOD RANCH LIMITED PARTNERSHIP, OONAGH WOOD, GENERAL PARTNER; PERSONAL REPRESENTATIVE OF THE ESTATE OF LEANOARD J. WOOD, DECEASED; OONAGH WOOD, TRUSTEE OF THE FAMILY TRUST UNDER THE WILL OF LEONARD J. WOOD, Dated December 10, 2003; PAUL AND PHYLLIS GREGG; PHIL LAMPERT: ANNA MARIE EVANS; EVANS RANCH NO. 1, L.L.C., And FREDRIC STEPHAN, <br><br>Plaintiffs, <br><br>v. <br><br>UNITED STATES OF AMERICA, <br><br>Defendant. | CIV 16-5014 <br><br><br> MEMORANDUM OPINION AND ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT, DOC. 27 |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

Pending before the Court is the Defendant's Motion for Summary Judgment, Doc. 27. In its motion, Defendant asserts Plaintiffs' allegations of negligence are barred by the discretionary function exception to the waiver of sovereign immunity under the Federal Tort Claims Act (FTCA). The Court finds that, contrary to Defendant's claims, Plaintiffs are not challenging the decision to implement Stage II fire restrictions. Therefore, as the Court has considered all filings, for the following reasons, Defendant's motion is denied.

**FACTUAL BACKGROUND**

Plaintiffs are all owners of private property in Custer County, South Dakota that was destroyed in the "Myrtle Fire," which ignited on July 19, 2012 in the Hell Canyon Ranger District of the Black Hills National Forest near Custer, South Dakota. The fire was sparked when a road grader operated by a United States Forest Service (USFS) employee struck a rock while blading a dirt road—Forest Service Road (FSD) 324.1D.

1

"It is the policy of the Congress that the national forests are established and shall be administered for outdoor recreation, range, timber, watershed, and wildlife and fish purposes." 16 U.S.C. § 528. Congress has delegated its authority to protect the national forests of the United States to the Secretary of Agriculture, authorizing and directing the Secretary "to develop and administer the renewable surface resources of the national forests for multiple use and sustained yield of the several products and services obtained therefrom." *Id.* at § 529. Further, in 16 U.S.C. § 551, Congress provided:

> The Secretary of Agriculture shall make provisions for the protection against destruction by fire and depredations upon the public forests and national forests which may have been set aside or which may be hereafter set aside . . . and he may make such rules and regulations and establish such service as will insure the objects of such reservations, namely, to regulate their occupancy and use and to preserve the forests thereon from destruction.

Specifically, the management and protection of the national forests falls upon the USFS. The USFS is organized into a four-tier hierarchy composed of the national headquarters in Washington, D.C.; nine regional offices across the country; 123 forest offices within those regions; and district offices within each forest. The National Forest Management Act establishes the framework for the management of the National Forest System and requires the USFS to develop and maintain a forest plan for each unit of the National Forest System. *See Native Ecosystems Council v. U.S. Forest Service*, 418 F.3d 953, 957 n. 1 (9th Cir. 2005). Then the USFS implements each forest plan by approving or disapproving site-specific actions, all of which must be consistent with the overall forest plan. *See id.* Further, administrative policy guidance to USFS employees is issued as directives, or through correspondence, by the office of the Chief of the Forest Service and by field officers. 36 C.F.R. § 200.4(b). These directives are issued through the Forest Service Directive System, which is comprised of the Forest Service Manual and the Forest Service Handbooks. *Id.* at § 200.4(b)(1).

In conformance with federal law and policy, the Black Hills National Forest developed and maintains a Forest Plan, which serves as a guide for resource management activities in the Black Hills National Forest. Part of that Plan was the Black Hills Forest 2012 Fire Management Plan. "The Fire Management Plan was developed to help fire personnel and decision makers determine the management response to an unplanned fire ignition." Bobzien Dec. at para. 9. "[It] identifies and integrates all Forest Service wildland fire management guidance, direction, and

information required to implement national fire policy and fire management direction in a single document, where it may be easily accessed by fire and resource personnel." *Id.*

Craig Bobzien was employed with the USFS as the Forest Supervisor of the Black Hills National Forest in 2012. As Forest Supervisor, Bobzien develops and maintains relationships with representatives from several different fire prevention agencies who play a role in the prevention and suppression of forest fires. The Forest Supervisor authorizes restrictions or closures, communicates those restrictions to affected agencies and ensures their review by law enforcement and legal counsel, as well as monitors enacted restrictions for compliance.

Bobzien referred to that year as "one of the big fire years," noting a number of other fires in 2012 and that it would have been likely that the fire danger rating in the Hell Canyon Ranger District area would have varied daily around the high, very high, and extreme ratings. The dryness and heat was cognizable early in the year, leading Bobzien to seek additional funding—known as Fire Severity Funds—from the Regional Forester on March 21, 2012 so that additional fire resources would be available for the upcoming season. Citing average temperatures in the lower elevations of the forest at 4 to 8 degrees above normal and precipitation as low as 25% of normal in the previous 30 days, fire potential for the month of April as above average, the occurrence and size of fires in the early spring as presenting a challenge, and expected weather conditions setting new highs at the five stations in the forest, Bobzien requested funds to support additional weekend and extended staffing due to "severe fire weather conditions."

Generally, weekly meetings are held between the Black Hills National Forests' Fire Management Officer and Assistant Fire Management Officer and other fire prevention agencies charged with prevention and suppression of fire responsibilities. One objective of these meetings is to monitor the technical aspects of any fire risk in the Black Hills National Forest, including the 10 hour, 100 hour, and 1,000-hour life fuel moisture levels, the energy release component, the National Fire Danger Rating System, the current and predicted fire weather forecasts, the current fire level and resistance to suppression, new starts, and fire acres burned, among other indicators. Bobzien implemented Stage 2 Fire and Smoking Restrictions for the Black Hills National Forest on June 29, 2012, following a meeting held that day. Bobzien considered the technical information presented, the benefits of aligning with the cooperating governmental entities, and other variables in making the decision to implement the restrictions.

Essentially, Bobzien weighed the risk of wildland fire against the risk of restricting use of the forest to the general public for recreation and to the work/profitability of any contractors working in the forest, as well as potentially placing any unduly burdensome restrictions on the ability of the public, some of whom maintain private residences within the Black Hills National Forest, to gain access to and from their lands via potentially restricted areas.

Doc. 39 at para. 13.

Fire restrictions are defined in three stages—Stage I, II, and III—and become more prohibitive with each stage. According to the Fire Prevention Program: Strategic Plan, a National Forest System Regional Handbook, "restrictions should be considered only after all reasonable prevention measures have been taken." Doc. 33-5 at 23. Under Stage II restrictions, individuals are prohibited from 1) building, maintaining, attending, or using a fire, campfire, or stove fire; 2) smoking, except within an enclosed vehicle or building; 3) using an explosive; 4) operating a chainsaw or other equipment powered by an internal combustion engine between 1:00 p.m. to 1:00 a.m.; and 5) welding, or operating acetylene or other torch with open flame. *Id.* Notably, operating a road grader is not prohibited under Stage II restrictions. Further, the next step in restrictions, Stage III, requires complete closure of the area. *Id.*

In addition to facilitating fire prevention and suppression, the Forest Supervisor is also charged with managing the forest's road system, including the maintenance of the forest's roads and trials. Forest Service Manual 7730-Road Operation and Maintenance states as its objective the operation and maintenance of National Forest System roads in a manner that meets road management objectives and provides for 1) safe and efficient travel; 2) access for the administration, utilization, and protection of National Forest System lands; and 3) protection of the environment, adjacent resources, and public investment. As part of the Forest Management Plan, and in accordance with federal policy requiring development of an annual maintenance plans, the Black Hills National Forest developed the Black Hills Forest 2012 Road Maintenance Plan, which includes a grid system whereby roads were inspected and maintained on a rotating basis.

FSR 324.1D is a level 2 maintenance category road located in the Hell Canyon Ranger District. Forest Service Handbook 7709.59 provides that a level 2 maintenance designation is

> [a]ssigned to roads open for use by high clearance vehicles. Passenger car traffic, user comfort, and user convenience are not considerations. Warning signs and traffic control devices are not provided with the exception that some signing, such as W-18-1 'No Traffic Signs,' may be posted at some intersections. Motorists

4

should have no expectation of being alerted to potential hazards while driving these roads. Traffic is dispersed recreation, or other specialized uses. Log haul may occur at this level. Appropriate traffic management strategies are either to: a) discourage or prohibit passenger cars, or b) accept or discourage high clearance vehicles.

Doc. 32-4 at 5. Thus, Level 2 roads are passable only by prudent drivers in high clearance vehicles and not maintained to be passable to standard four-wheel passenger cars. *Id.* at 7.

Blading of a nonsurfaced road seeks to restore "the surface, crown, and super elevation of the traveled way to original configuration to protect the road investment, minimize damage to adjacent land and resources, keep road stable, provide proper drainage, and/or facilitate traffic." Doc. 32-3 at 10. When weather conditions are dry, it becomes difficult to work on gravel roads because of their lack of moisture, so the USFS will switch to do basic maintenance on native surface (dirt) roads instead. These roads are all on a grid which serves as a guideline providing a maintenance schedule on a five-year rotation. On July 19, 2012, Larry Walker, an equipment operator for the USFS, was assigned to do grid maintenance on FSR 324.1D—the only remaining road in that area on the grid that had not yet been maintained that year. FSR 324.1D is an approximately one-mile long, dead-end, native surface (dirt) road that ends where private property begins and is used mostly by elk hunters. Before July 19, 2012, Walker had taken a motor grader to the work site and conducted a survey of the work to be done on the road.

Walker began using the motor grader in first gear, working his way south on FSR 324.1D, knocking down high spots and filling in ruts. By approximately 2:15 p.m., Walker reached the end of FSR 324.1D and began working his way back north. At approximately 2:19 p.m., Walker was about half-way back to the beginning of the road when he first saw white smoke. He immediately called Great Plains Interagency Dispatch on his USFS radio and reported the smoke and his location. After reporting the smoke, he continued north on the road and encountered the fire on the east side of FSR 324.1D. After attempting to cut a fire line on the southern flank of the fire with the motor grader, Walker backed the motor grader back onto the road and continued north to a safer intersection away from the advancing fire. Black Hills National Forest Engine 633 responded to the fire by 2:34 p.m. Two engines followed at 2:39 p.m. and 2:47 p.m., respectively. Ultimately, 9,886 acres of federal and private land burned that

day. As the unusual heat and dryness continued, Bobzien later issued a "Hoot Owl" restriction on July 23, 2012, restricting work by Forest Service employees during the hottest part of the day.[1]

Specific to this federal action, Plaintiff Fredric Stephan filed a complaint on March 23, 2015 alleging the USFS was negligent in causing the ignition of the fire and allowing the fire to spread. Civ. 15-5021, Complaint, Doc. 1 at 4. Specifically, Stephan asserted the USFS employee "failed to properly operate the road grader/blader in a manner so as not to cause ignition of the fire," that he was "operating the road grader/blader on a day when the air temperature, lack of moisture and humidity and extremely dry conditions should have prevented such operation," and that the employee did not have "the proper resources and equipment to insure that the fire did not spread to other fuel sources and ignite adjoining properties on fire." *Id.* On February 24, 2016, Plaintiff Keller Special Trust and others filed a complaint similarly alleging that the United States was negligent in 1) kindling the fire on its real property and leaving it unquenched; 2) permitting the fire to spread beyond the U.S.'s control so as to endanger Plaintiffs' real property; and 3) failing to plan, conduct, and supervise its management, operations, and road maintenance responsibilities, to operate its road maintenance equipment, and to maintain its roads "despite the then existing hazardous and dangerous fire conditions with their open and known risks." Civ. 16-5014, Complaint, Doc. 1 at 5. An order consolidating the two cases was entered on June 9, 2016. Civ. 16-5014, Order Consolidating Cases, Doc. 10.

Defendant has moved the Court for summary judgment pursuant to Fed. R. Civ. P. 56 on all claims. Defendant asserts summary judgment in favor of the United States is proper based on the discretionary function exception to the FTCA set forth at 28 U.S.C. § 2680(a). In response, Plaintiffs argue that the challenged conduct is entirely devoid of an element of judgment or choice or, in the alternative, does not involve the kind of judgment or choice the discretionary function exception was designed to protect. For reasons explained herein, Defendant's motion is denied.

## LEGAL STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the

---

[1] "Hoot Owl" is a slang term for working in the early morning and evening hours, or when you would hear an owl hoot, and not working or restricting work during the hottest part of the day. This restriction was applicable only to Forest Service personnel and did not apply to governmental entity cooperators, to contractors, or to the general public. Thus, only Forest Service activities performed in the field, i.e., out of doors, in the forest, by Forest Service employees and staff were further restricted by the Hoot Owl restrictions.

movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A party asserting that a fact cannot be . . . disputed must support the assertion" either by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the . . . presence of a genuine dispute[.]" FED. R. CIV. P. 56(c)(1)(A)–(B). "The movant can also establish the absence of a disputed material fact by showing 'that an adverse party cannot produce admissible evidence to support the fact.'" *Jensen v. Hy-Vee Corp.*, 2011 WL 1832997, at *1 (D.S.D. May 13, 2011) (quoting FED. R. CIV. P. 56(c)(1)(B)).

In a motion for summary judgment, the moving party bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotations omitted). Once this burden is met, the burden then shifts to the non-moving party to demonstrate "that a fact . . . is genuinely disputed" either by "citing to particular parts of materials in the record," or by "showing that the materials cited do not establish the absence . . . of a genuine dispute." FED. R. CIV. P. 56(c)(1)(A)–(B). "For purposes of summary judgment, the facts, and inferences drawn from those facts, are 'viewed in the light most favorable to the party opposing the motion.'" *Jensen*, 2011 WL 1832997, at *2 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

As a threshold matter, the Parties point out that the Eighth Circuit has not yet explicitly ruled on who bears the burden of proof with regard to the discretionary function exception to the FTCA. In a case where the burden of proof was irrelevant, the Eighth Circuit provided in a footnote,

> Our sister courts of appeals are divided on the burden-of-proof issue. *See St. Tammany Parish ex rel. Davis v. FEMA*, 556 F.3d 307, 315–16 n.3 (5th Cir. 2009) (collecting cases). Although we have not yet taken a formal position on this precise issue, we have (1) repeated the general rule that "[t]he burden of proving federal jurisdiction . . . is on the party seeking to establish it, and 'this burden may not be shifted to' the other party," *Great Rivers*, 615 F.3d at 988 (quoting *Newhard, Cook & Co. v. Inspired Life Ctrs., Inc.*, 895 F.2d 1226, 1228 (8th Cir. 1990)); (2) applied such principle in an FTCA case, *see Riley*, 486 F.3d at 1031–32 (quoting *Green Acres*, 418 F.3d at 856); (3) stated, in conjunction with the second part of the discretionary-function-exception test, "it is [the plaintiff], not the United States, who must assert facts that show the decision was not based on policy considerations," *Dykstra*, 140 F.3d at 796; and (4) affirmed a district court's decision placing the burden upon the plaintiff, *see Bacon v. United States*, 661 F.Supp. 8, 10 (E.D.Mo. 1986), *aff'd*, 810 F.2d 827 (8th Cir. 1987).

*Hart v. United States*, 630 F.3d 1085, 1089 n. 3 (8th Cir. 2011). Thus, "the Eighth Circuit has strongly hinted that the burden rests with the plaintiff[.]" *Compart's Boar Store, Inc. v. United States*, 122 F.Supp. 3d 818, 828 n.6 (D. Minn. 2015). Therefore, this Court holds that the Plaintiff has the burden of proving jurisdiction, which includes proving the action complained of falls outside of the discretionary function exception to the FTCA.

## DISCUSSION

The FTCA waives sovereign immunity and allows individuals to sue the United States for damages for loss of property resulting from the negligence or wrongful acts of its employees within the scope of their employment if and to the same extent as a private person would be liable to the claimant under the same circumstances. 28 U.S.C. § 1346(b)(1). There are numerous exceptions to this waiver of sovereign immunity, including the discretionary function exception at issue here. That exception provides that the Government is not liable for

> [a]ny claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

*Id.* at § 2680(a).

A well-established, two-part test determines when the discretionary function exception applies. The first inquiry is whether the agency's actions require "an element of judgment or choice." *United States v. Gaubert*, 499 U.S. 315, 322 (1991) (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). Second, that judgment must be of the kind that the discretionary function exception was designed to protect. *Id.* at 322–23. "The exception exists to protect the discretion of the executive or the administrator to act according to one's judgment of the best course and to prevent judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy." *Layton v. United States*, 984 F.2d 1496, 1499 (8th Cir. 1993) (internal citations omitted) (citing *Dalehite v. United States*, 346 U.S. 15, 34 (1953) and *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 814 (1984)). In sum, "the challenged governmental action must be the product of judgment or choice, and that judgment or choice must be based on considerations of social, economic, and political policy." *Id.*

> Where a statute, regulation, or policy prescribes a course of action to be followed by a government employee, the employee does not have discretion to violate the regulation; actions in contravention of the regulation are not protected by the discretionary function exception. Where conduct is not so prescribed, however, the Supreme Court has repeatedly said that it is the nature of the conduct, rather than the status of the actor, that governs whether the discretionary function exception applies in a given case. In other words, the fact that determinations are made at a relatively low level does not prevent the applicability of the exception. Moreover, if a regulation allows the employee discretion, the very existence of the regulations creates a strong presumption that a discretionary act authorized by the regulation involves consideration of the same policies which led to the promulgation of the regulations.

*Id.* at 1499–1500 (internal citations omitted). The burden is on the plaintiff to rebut that presumption. *See Demery v. United States Dept. of Interior*, 357 F.3d 830, 833 (8th Cir. 2004).

Bobzien's authority to close or restrict use of the Black Hills National Forest stems from 36 C.F.R. § 261.50, which states that the Forest Supervisor "may issue orders" which close or restrict the use of described areas, or any National Forest System road or trail within the area over which he has jurisdiction. 36 C.F.R. § 261.50(a)–(b). "An order may close an area to entry or may restrict the use of an area by applying any or all of the prohibitions authorized in this subpart or any portion thereof." *Id.* at § 261.50(a). The permissive language of the regulation does not prescribe a time or scenario in which restrictions or closures must take place. *See Dykstra v. Bureau of Prisons*, 140 F.3d 791, 796 (8th Cir. 1998) (indicating "use of the term 'may' in . . . regulations imports discretion"). The regulation only requires that if and when a closure or restriction does take place, the order "shall" describe the area, road, or trial to which the order applies, specify the times during which the prohibitions apply, state each prohibition applied, and be posted in accordance with § 261.51. *Id.* at § 261.50(c). Section 261.54 lists a number of actions which may be prohibited on National Forest System roads "*[w]hen provided by an order.*" (Emphasis added). The entering of that order, however, is discretionary.

The discretionary language and the undisputed facts that Bobzien weighed a number of factors in his cost vs. benefit analysis of imposing the Stage II restriction clearly puts Bobzien's decision to impose that restriction within the discretionary function exception of the FTCA. Defendant alleges that Plaintiffs, recognizing this, have craftily drafted their argument to circumvent the discretionary function exception when they are really challenging the earlier decision not to prohibit grading when the Stage II restrictions were imposed. Plaintiff, on the other hand, insists that Walker violated mandatory safety and maintenance duties when grading

on July 19, 2012 and that the choice of whether or not to grade or whether or not safety and maintenance standards are to be followed do not lend themselves to the exercise of discretion meant to be protected by the discretionary function exception.

Indeed, "the question of how the government is alleged to have been negligent is critical" to the inquiry as to whether the discretionary function exception applies. *Whisnant v. United States*, 400 F.3d 1177, 1185 (9th Cir. 2005). Therefore, "determining the precise action the government took or failed to take (that is, how it is alleged to have been negligent) is a necessary predicate to determining whether the government had discretion to take that action." *Young v. United States*, 769 F.3d 1047, 1054 (9th Cir. 2014). However, as Defendant rightly points out, "[a] plaintiff should not be permitted to overcome application of the [discretionary function exception] through creative pleading." *Baer v. United States*, 722 F.3d 168, 176 (3d Cir. 2013). See also *Fisher Bros. Sales, Inc. v. United States*, 46 F.3d 279, 286 (3d Cir. 1995) ("We know of no authority for the proposition that plaintiffs, by the manner in which they draft their complaints, may dictate that their claims are 'based upon' one government employee's actions and not another's.); *Gen. Dynamics Corp. v. United States*, 139 F.3d 1280, 1283 (9th Cir. 1998) ("Courts are not required to, and should not, simply look at the surface of a complaint for the purpose of ascertaining the true basis of an attack upon something the government has done."). Defendant compares Plaintiff's case to those of *Fisher Bros.*, *Gen. Dynamics Corp.*, and *El-Shifa Pharm. Indus. Co. v. United States*, 402 F.Supp. 2d 267 (D.D.C. 2005), to establish that Plaintiff is merely using creative pleading to get around the discretionary function exception. However, the case at hand is easily distinguishable from those presented by Defendant. All three of the cited cases present relatively similar factual situations in which plaintiffs characterize their actions to challenge alleged negligence in the analyses and evidence compiled by government actors prior to other government actors using those analyses and evidence to make a policy decision. *See Fisher Bros.*, 46 F.3d at 285–86 (alleging laboratory tests of underlying data relied upon were negligently performed); *Gen. Dynamics Corp.*, 139 F.3d 1285–86 (alleging negligent preparation of report relied upon by prosecutor); *El-Shifa Pharm. Indus. Co.*, 402 F.Supp. 2d at 271 (alleging negligent analyses of soil samples and other evidence "that led government to conclude that the El-Shifa plant was producing materials for chemical weapons and to target the plant for destruction" by military force as ordered by the President). In this case, however, Plaintiffs are not alleging that the data Mr. Bobzien used to impose the Stage II restrictions was

negligently compiled and should not have been relied upon. Surely, those allegations would have fallen squarely within the discretionary function exception.

> When one appreciates that virtually all policymaking involves judgments about the reliability of the available data, it is not difficult to predict the impact upon policymakers that would result from the fear of virtually unlimited liability and the prospect of virtually interminable litigation associated with the plaintiffs' theory of liability.

*Fisher Bros.*, 46 F.3d at 287. Instead, Plaintiffs allege that, although blading was permitted under the Stage II restrictions then in place, Walker conducted that blading negligently.

In response, then, Defendant argues that Walker's action in driving the motor grader that day still falls under the discretionary function exception. As established above, the first inquiry is whether the agency's actions require "an element of judgment or choice." *Gaubert*, 499 U.S. at 322 (quoting *Berkovitz*, 486 U.S. at 536). An employee does not have discretion to violate a mandatory policy. *See Layton*, 984 F.2d at 1499–1500. Where conduct is not mandated, it is the nature of the conduct that is evaluated, regardless of the actor, that determines application of the discretionary function exception. *See id.* According to national policy, blading "shall" be performed "only when the roadbed can support the equipment without damage" and is preferable when the roadbed is "near optimum moisture content." For level 2 roads, blading is performed "when improper crown, ruts, potholes, corrugations, sod, or vegetation begin to concentrate water runoff and start erosion." Only affected areas are to be bladed. The "recommended crew size" when blading is one equipment operator, one laborer, and a flagperson "as needed." Further, listed equipment includes one grader, one pickup, and one rock rake ("if necessary"). National policy also provides a "recommended procedure," which includes placing warning signs and safety devices, removing larger loose rocks which may be hazardous, and using a rock rake if rocks are numerous. *Id.* at 11.

Further, the Health and Safety Handbook of the USFS also offers general safey guidelines. In its introduction, the Handbook provides, "[d]irection in the Handbook generally is written in the imperative mood, which conveys mandatory compliance: 'Wear a hardhat on the fireline.'" In operating heavy equipment, operators are to "[i]nvestigate worksites for unsafe conditions before moving machines and people into operating and work positions;" [p]rovide and properly secure fire extinguishers, and ensure that they are readily accessible and maintained in a fully charged, operable condition on heavy equipment, such as motor graders;" and "[b]e aware

of changing conditions and avoid hazardous situations created by terrain and environmental conditions that may endanger employees in the performance of their jobs."

Defendants argue that national policy and the Health and Safety Handbook do not provide guidance that is both "mandatory *and* specific" enough to remove Walker's discretion. For example, though an investigation may be required, the Handbook does not establish what type of investigation is required, nor does it define "unsafe conditions." Regardless, even if there is an element of choice involved, that judgment must be of the kind that the discretionary function exception was designed to protect. *Gaubert*, 499 U.S. at 322–23. "Where the challenged governmental activity involves safety considerations under an established policy rather than the balancing of competing public policy considerations, the rationale for the exception falls away and the United States will be held responsible for the negligence of its employees." *Aslakson v. United States*, 790 F.2d 688, 693 (8th Cir. 1986). The challenged conduct is neither regulatory nor administrative decision-making grounded in policy. Rather, Plaintiffs allege "ordinary garden-variety negligence" that does not come within the scope of the discretionary function exception. *Id.* at 694.

Defendant's argument that the decision to blade furthered the USFS' overall objectives of "safe and efficient travel; access for administration, utilization and protection of [National Forest System] lands; and protection of environment, adjacent resources, and public investment" is not supported by the record. Further, Defendant's underlying argument that because a policy decision was made to allow blading therefore protects the act of blading that took place after that decision was made is to no avail. In following Defendant's argument to its logical conclusion, when blading is permitted under a particular fire restriction level in place at that time, safety and maintenance standards may be abandoned. Finally, though Defendant briefly addressed Plaintiffs' allegations that the USFS employees were negligent in their handling of the fire after it was ignited, the Court does not find enough of a factual basis to rule on the claim at this stage. Holding the USFS accountable for compliance with its own safety policy regarding its road maintenance and fire control will not undermine its governmental function. Plaintiffs have met their burden in showing the action complained of falls outside the discretionary function exception, hence, the conduct of USFS officials must be reviewed in accordance with South Dakota's tort law standards. Accordingly,

IT IS ORDERED:

1. That Defendant's Motion for Summary Judgment, Doc. 27, is DENIED.

Dated this 20th day of October, 2017.

BY THE COURT:

*Lawrence Piersol*
Lawrence L. Piersol
United States District Judge

ATTEST:

JOSEPH HAAS, Clerk of Courts

BY: *Deb Peterson*
Deputy